## PHILLIPS SHEET & TIN PLATE CO. v. STEPHENS-ADAMSON MFG. CO.

(Circuit Court of Appeals, Fourth Circuit.   May 11, 1921.)

No. 1829.

1. Sales ☞88—Contract with ambiguous terms for construction by jury.

A contract for the furnishing of steel by defendant to plaintiff for a specified use, made by an accepted order and preceding correspondence, showing that the thing sold was to be "commercial hot rolled steel," "to be absolutely straight with true edges," the order also containing a sketch showing how it was to be used, in view of the necessity of determining the meaning of such specifications in the trade, and where the requirements must have been understood by defendant, held properly submitted to the jury for construction in the light of the correspondence and negotiations between the parties.

2. Principal and agent ☞124(3)—Sales ☞182(4)—Acceptance under contract and agent's authority held for jury.

Whether payment for and attempted use by plaintiff of steel delivered by defendant on a contract constituted an acceptance under the contract or was pursuant to an agreement which bound defendant to replace the steel if found unfit for the purpose intended, and whether the agent representing defendant had authority to make such agreement, held questions for the jury.

3. Sales ☞179(6)—Effect of conditional acceptance stated.

Where steel shipped by defendant to plaintiff under a contract was accepted on condition that it should be reconditioned or replaced in case it

proved unfit for the use intended, a failure of the condition operated to remit the parties to their previous status and reinvest plaintiff with the right to reject the steel and recover the money paid for it.

In Error to the District Court of the United States for the Northern District of West Virginia, at Wheeling; Alston G. Dayton, Judge.

Action at law by the Stephens-Adamson Manufacturing Company against the Phillips Sheet & Tin Plate Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. D. Stewart, of Pittsburgh, Pa. (Charles McCamic, and McCamic & Clarke, all of Wheeling, W. Va., and Weil & Thorp, of Pittsburgh, Pa., on the brief), for plaintiff in error.

Nelson C. Hubbard, of Wheeling, W. Va., and J. Sidney Condit, of Chicago, Ill. (Walter H. Jacobs and Winston, Strawn & Shaw, all of Chicago, Ill., and Hubbard & Hubbard, of Wheeling, W. Va., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and BOYD, District Judge.

KNAPP, Circuit Judge. Phillips Sheet & Tin Plate Company (now Weirton Steel Company), plaintiff in error, herein called defendant, was a manufacturer of strip steel at Weirton, W. Va. Stephens-Adamson Manufacturing Company, herein called plaintiff, manufactures conveyers and transmission machinery at Aurora, Ill. La Salle Steel Company of Chicago was defendant's exclusive sales agent in that city and adjacent territory, including Aurora. About the 1st of May, 1917, one Grange, a salesman of the La Salle Company, called upon plaintiff in the course of soliciting business and had an interview with Pierce, then its purchasing agent, and Phillips, the foreman of its steel shop. He was informed of the articles made by plaintiff, and particularly of the conveyer known as the "Lehr pan," which appears to have been quite fully explained; learned that plaintiff was using blue annealed steel for making this article; said that hot rolled strip steel would do the same work as blue annealed sheets and was just the steel for that kind of a pan; was told that the pans had to be absolutely flat, so as to carry bottles standing upright without falling over through a Lehr oven under intense heat; but repeated that hot rolled strip steel would do the work and was "a better product." No order was given at the time, but on June 1st Pierce wrote the La Salle Company that "we are in the market for about 75 tons of strip steel," stating dimensions and other requirements, and asking for "best price and delivery by return mail." Reply stated that the matter had been taken up with "our mill," with request to advise "what delivery they could effect." This was followed three days later by an offer to furnish the steel at a price and on terms named, delivery to be made within the next four to six weeks.

Thereupon, on June 7th, plaintiff sent the La Salle Company an order for—

"2000 strips #12 (.109) gauge hot rolled strip steel (10) 10½ inches wide 30x20x10 feet long. No pcs. Must be soft enough for bend below, which is

very sharp bend. Above to be absolutely straight and with true edges. See sketch. Cannot use curved sheets or curved edges, as we have not allowed anything for shearing."

On the order was a pen and ink sketch showing a straight bend at each side of the strip, making two flanges. The line of the bend is drawn straight. In the letter transmitting the order plaintiff says:

"Please note our specifications carefully and make sure that these come in straight. They cannot be curved on the edges."

The second order, on June 8th, was for—

"1,000 strips #12 (.109) gauge hot rolled strip steel (10) 10½ inches wide 7′ 0″ long. No pc's. Must be straight edgewise. Watch carefully. Same as our order #68713 for same purpose."

Upon receipt of the first order the La Salle Company wrote that their quotation "was based on furnishing commercial hot rolled steel with a natural hot rolled round edge," and that they were sending the specifications on to their works. Replying to this on June 9th plaintiff wrote that—

"We cannot have this steel come to us in anything like a curved condition. Please note sketch on this letter and you will see to what we refer."

On June 11th, as Pierce testified, he had a conversation with Leeds, president of the La Salle Company, in which he told the latter that the material would be used in Lehr ovens, and they wanted the steel to be of exceptionally good grade, and that Leeds said "he would guarantee that the steel we got would be satisfactory to our purpose." In that conversation Leeds advised that the strips be made a little wider, so that they could be cut along the edges, and thus get the edges straight, and Pierce assented. Confirming this by letter of same date, he directed that the steel be made 10¼ inches wide, instead of 10 inches, and referring to the bend shown on the sketch said:

"This bend is rather sharp, and although we do not care to get this material too soft, as it is to be used in a Lehr oven, still we want it at least just as soft as blue annealed sheets."

Under date of June 15th defendant sent plaintiff acknowledgments of the two orders. On the 18th Pierce wrote the La Salle Company that the acknowledgments had been received and that defendant seemed—

"to have these orders very well in hand, with the exception of the quality specifications; in other words, we would imagine from their acknowledgments that you did not call their attention to the operation which we are going to perform on these sheets. Of course, this matter is up to you, but we should think it would be well to advise them on this point also."

Thereupon, on the 20th, Leeds wrote defendant:

"Confirming the writer's conversation, when at the mill, the Stephens-Adamson Mfg. Co. wish to call our attention to the sketch drawn on their original order showing the purpose for which this material is intended. In the acceptance of this order, you are agreeing to furnish material to meet their requirements in accordance with this sketch."

From this correspondence it will be seen that defendant agreed in substance to furnish commercial hot rolled strip steel, to be abso-

lutely straight and with true edges, and of a quality capable of fabrication in the manner shown by the sketch. The trade terms "absolutely straight" and "with true edges" were stated by experts to mean "straight in all directions," "flat on the surface," "not wavy or buckled." The steel actually furnished arrived at plaintiff's plant about the 25th of August, and a part of it was then unloaded. According to plaintiff's testimony, it was badly bent, corrugated along the edges, wavy and buckled; the buckles in some instances being as high as an inch and a half or more from the floor and several inches in width. The La Salle Company was promptly notified. Grange, the salesman above mentioned, came the next day, and, after examining the steel said, as Phillips swore, that it was "in terribly bad condition." On August 27th Pierce wrote the La Salle Company that the steel—

"has come in badly bent, twisted and some of the sheets are corrugated along the edges. We believe that your representative"—referring to Grange— "fully realizes that this steel cannot be used for material which we are manufacturing unless it is thoroughly straightened."

On the 28th the La Salle Company wrote defendant the substance of Pierce's letter and said:

"You will see from the above this complaint calls for your immediate attention. We therefore want you to advise us without delay what action we shall take."

On the last-named date Pierce wrote again to the La Salle Company that they had gone over the matter carefully and could see no way of straightening the strips, and added:

"We wish, therefore that you would arrange to take them off our hands and advise us of disposition of this car. The strips are certainly not as we ordered them, and cannot be used unless they are straight."

This was followed on the 30th with another letter, in which Pierce says:

"We understand you have taken this matter up with the Phillips Sheet & Tin Plate Company and that you expect advices from them shortly. It will be necessary for us to have immediate information, as we are holding this car on our track and must know what is to be done with it."

On the 31st the La Salle Company wired defendant that they had told plaintiff to continue unloading the car to save demurrage, and asked to be advised of defendant's wishes "as to straightening or returning stock," and "if we shall adjust best way possible." Defendant wired back to—

"make earnest endeavor to have them keep steel; if necessary make concession. * * * If you find they will not use steel, have it returned. Will replace in three weeks."

In the meantime Vice President Kelly of the La Salle Company had gone to plaintiff's plant to examine the steel, and had said, according to Phillips, that it was "bad stuff." While he was there it was proposed to run the steel through plaintiff's "bending roller," and a strip was treated in that way, with the result that "it looked fairly good," and this seemed to promise a solution of the difficulty.

On the 5th of September Leeds went to Aurora, as defendant had requested a few days before, and on examining the steel said, as was testified by Kendall, plaintiff's general superintendent:

"Well, that stuff is certainly in rotten shape, but I would like to see those rolls Kelly was talking about."

The outcome of his visit was in brief an arrangement by which plaintiff undertook to run the steel through its roller, in the hope, and seemingly with the expectation on both sides, that it would thereby be put in the required condition, and plaintiff was to be allowed $300 for doing the work. Asked what would happen if the strips did not come out straight, Leeds repeated the assurance in various forms, as stated by plaintiff's witnesses, that "his company would take care of them"; "that they stood back of every pound of steel they sold"; that "we are a reputable house and, if there is anything wrong, we will make it right; quit worrying about that"; that "if this steel does not work, we will see that the steel is reconditioned or replaced"; and plaintiff claims to have relied upon that assurance. It was also testified that Leeds authorized plaintiff to cut the strips into 10-foot lengths, with some 7-foot, as would be needful for their intended use. And when it was explained to him that this would involve punching certain holes in the strips, as their dies were "fitted for punching the holes and countersinking them all in the same operation," and after talking "this whole matter over thoroughly," Leeds said, according to Pierce, "You go ahead and cut up that material and roll it, and there is no doubt but what it will be satisfactory," with more to the same purport.

In this interview Leeds was told that plaintiff would like to discount the bill for the steel, but hesitated to do so because of fear that it could not be straightened and made fit for use, and Leeds replied to the effect that plaintiff wouldn't be taking any chances, as "we are standing back of the shipment." Thereupon a check was given him, to the order of defendant, and which the latter soon afterwards collected, for $8,791.82, the purchase price of the steel less the $300. In his letter of the same date, transmitting the check to defendant, Leeds said:

"The writer called at their plant to-day and inspected the material, and found the same in rather bad condition, due to improper handling before the material cooled."

A shorter summary will suffice for the subsequent happenings. Plaintiff cut up and put through the roller about two-thirds of the shipment, punching holes in the ends of the strips, and clipping them at the same time. Some of the material was taken to another concern, the Richard Wilcox Company, to be formed into Lehr pans, but it did not answer the purpose; the pans were all bowed. The La Salle Company was notified, and Kelly came to Aurora. He went to the Wilcox plant, examined the pans that had previously been made; and had several more made in his presence, all of which bowed. At his request some of the strips were taken back to plaintiff's plant, and pans there made in different ways, but all of them bowed; the ends

being about half an inch higher than the center. Samples of the steel were sent to defendant's plant and there reconditioned. When returned to plaintiff they appeared to be straight, but pans could not be made of them that did not bow. A few strips were annealed, but with no better result. In short, as plaintiff claims, the steel, when worked, was not straight, and would not make a straight pan. There was much correspondence between the parties, and some talk of replacement; but nothing led to an adjustment of their differences. The upshot at last was a demand by plaintiff for a return of the money paid for the steel. This the defendant refused, and plaintiff sued. The jury gave a verdict in its favor, and defendant brings the case here.

We have thus set forth in considerable detail the proofs relating to the contract, and to the quality of the steel delivered, and shall further refer to the testimony on these and other issues, because, as seems to us, the recital shows convincingly that the substantial questions raised by defendant were questions of fact for the jury to determine.

[1] First, as to the contract itself. Defendant insists that it is so clear and unambiguous that its construction was for the court, and therefore it was error to submit its meaning to the jury. But to this we cannot assent. What was meant by "commercial hot rolled strip steel"? True, the word "commercial" does not appear in either of the two orders, but the La Salle Company's letter of June 8th says:

"Our quotation was based on furnishing commercial hot rolled steel with a natural hot rolled edge."

And, apart from this, would it not be understood that plaintiff was to get steel of commercial quality? And what was meant by "absolutely straight"? Have those words a technical meaning, known to the trade, which gives certainty to what defendant undertook to furnish? And what of the sketch drawn on the first order, and the notation on the second that it was "same as our order # 68713, for same purpose," and of the sketches shown on plaintiff's letter of June 9th? What is their significance, and what obligation did defendant assume when it accepted orders which these sketches, to say the least, more exactly defined? Was it thereby bound to know the particular use for which the steel was ordered, and did it impliedly promise to supply an article suited to that use?

These and other questions which might be asked demonstrate to our minds that the orders and acceptances, which defendant says constitute the entire contract, are by no means free from ambiguity. It was therefore proper, under a familiar rule of law, to show the preceding negotiations and the knowledge thus acquired by defendant of the specific purpose for which the steel was wanted, in order that the jury might determine what it actually undertook to furnish. The La Salle Company was defendant's agent, with full authority to bind it in effecting a sale, and the information obtained by that company, through its salesman or otherwise, must be deemed information which defendant possessed, and on which it acted, when it accepted plaintiff's orders. It follows that the correspondence between plaintiff and the

274 F.—13

La Salle Company, the interviews with its representatives, and all the other incidents of the transaction, were admissible in evidence and rightfully taken into account.

Whether the steel received by plaintiff on the 25th of August was of the kind and quality which defendant had agreed to deliver, even according to its own theory of the contract, was clearly a question of fact for the jury. On this issue it is enough to note, in addition to what is stated above, that two experts, apparently disinterested, testified positively to the effect that the steel was not only wavy and buckled, but that it had not been manufactured in accordance with standard practices; that it appeared to have been finished at a very low temperature; that it was not commercial hot rolled steel, did not comply with the specifications in the orders, and was of little more value than so much scrap. In view of this testimony, the point may be passed without further comment.

[2] It is insisted that plaintiff accepted the steel, and therefore its only remedy, if entitled to any relief, was an action for damages for breach of warranty. But acceptance cannot well be predicated on what occurred when the steel reached Aurora, for unloading had scarcely begun before plaintiff discovered its condition, and at once notified the La Salle Company that it was not as ordered and could not be used, and asked to have it taken "off our hands and advise us of disposition of the car." This was a clear rejection of the steel, which was plaintiff's right, if it did not conform to contract requirements. The claim must therefore rest on the arrangement made with Leeds on the 5th of September. At that time Leeds expressed the utmost confidence, and Pierce appears to have believed, as he had written on the 31st of August, that the steel could be straightened and made usable by running it through their roller. What the arrangement was which they then made is the subject of sharp dispute. Leeds says that plaintiff undertook to put the steel in proper order for its use, was allowed $300 for doing the work, and paid the balance of the purchase price, and thus the matter was settled and ended. On the contrary, Pierce and other witnesses say that this was on the express and distinct condition that, if the defects were not corrected by the rolling operation, defendant would recondition the steel or replace it. It was plainly a question for the jury, and their verdict is conclusive.

But defendant contends that Leeds had no authority to make such an agreement, and therefore it is not binding. This, also, in our opinion, was a question of fact. All the circumstances indicate that the La Salle Company held important relations with defendant and was something more than an ordinary agent. And since it appears—to mention nothing else—that Leeds wired on August 31st for "your wishes as to straightening or returning stock," and "if we shall adjust best way possible," and that defendant wired back to "make earnest endeavor to have them keep steel, if necessary make concession," and added, "if you find they will not use steel have it returned, will replace in three weeks," we think it was for the jury to say whether he was authorized to make the agreement which plaintiff's witnesses testify was made a few days later.

[3] The applicable principle of law in such case is well settled. If plaintiff's acceptance at that time was only on the condition named, and in reliance upon the promises of Leeds, as the jury must have found, the failure of that condition operated to remit the parties to their previous status and reinvest plaintiff with the right to reject the steel and recover the money paid for it. Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69, 29 L. Ed. 393; Frankfurt-Barnett Co. v. William Prym Co., 237 Fed. 21, 150 C. C. A. 223, L. R. A. 1918A, 602; Benjamin on Sales, vol. 2, 798, 799.

These are the principal questions presented by the record, and it is but repeating to say that in our judgment they are all questions of fact, which were properly submitted to the jury. The instructions state the issues fairly and correctly, and the exceptions thereto require no discussion.

Examination of the minor questions discloses no reversible error, and the judgment will therefore be affirmed.

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
    *Certiorari denied 256 U. S. —, 42 Sup. Ct. 50, 65 L. Ed. —.